### J. F. THERMAL PRODUCTS and New Hampshire Insurance Co., Petitioners,

v.

### Andrew T. PARKER, Respondent.

### No. 52916.

Court of Appeals of Oklahoma, Division No. 2.

Oct. 16, 1979.

Released for Publication by Order of Court of Appeals Nov. 15, 1979.

Dale F. Whitten, Whitten, McDaniel, Osmond, Goree & Davies, Tulsa, for petitioners.

John W. Young, Sapulpa, for respondent.

BRIGHTMIRE, Judge.

The 38-year-old claimant, Andrew Parker, was hired by J. F. Thermal Products, Inc. in March 1975 and worked for it as a "fitter-welder" until he became disabled in July 1976. His claim for workers' compensation was heard July 31, 1978 when he was awarded compensation after being found to be totally and permanently disabled as a result of work-related lung damage. The employer appealed to the court en banc which affirmed the order but modified it to reflect its finding that the employer under the circumstances surrounding the injury was not harmed by claimant's failure to give the statutory 30 day notice in writing. The employer seeks review here and in support of its request for vacation of the order advances a single legal hypothesis—that the award "is not supported by competent evidence with any probative value."

We affirm the award.

### I

During the 15 months or so that Parker worked at Thermal he arc welded inside "pressure vessels" most of the time. The vessels were described as being round shells between 18 and 36 inches in diameter and about 12 feet long. Five feet from one end each large pipe was closed off by a two-inch thick "dish head" through which ran a smaller four-inch pipe. Parker's job was to crawl through the seven foot end of the shell and weld the smaller pipe to the dish head and to metal bracing located at intervals between the head and the end of the vessel. Claimant said he was chosen to do

this work because he was the only one slender enough to squeeze into the tube. The vessel was not ventilated nor was plaintiff furnished a respirator, and since his body tended to obstruct the escape of smoke and fumes generated ahead of him during the arc welding process he was forced to inhale the contaminants for several hours daily.

Then one day Parker got sick. Sharp pains pierced his chest and he experienced breathing difficulties and dizziness. "I was spitting up and coughing up and vomiting blood and phlegm and other stuff . .," he said. He reported this to the superintendent and refused to weld inside any more of the tubular channels. He tried to continue doing more open type work but three weeks later was forced to enter a hospital where his lungs were pumped out. Later his physician told him he had "emphysema, bronchitis, and pleurisy and that [his] lungs were full of fluid and foreign matter."

Parker, a non-smoker, said until July 1, 1976, he never had had trouble with his lungs and was able to do any kind of work he wanted to. Since then, however, his physical capabilities have been extremely limited. He continues to experience serious breathing difficulties. His lungs continue to fill with fluid. He continues to cough and spit up blood and phlegm.

Claimant had the Acme Research and Testing Laboratories analyze a welding rod like those used for arc welding at Thermal. In a toxicology report the testing agency's chemist said he found the flux coating of a welding rod to contain three toxic ingredients, namely, manganese, arsenic, and boron. The chemist concluded "that an electric welder using welding rods containing the above components in a closed space, would inhale these toxic ingredients which are [released] during the process of welding . . . [and] would suffer various types of metal fume poisoning."

One of claimant's physicians was of the opinion that his pulmonary pathological problems—emphysema and bronchitis—were "caused . . . or aggravated by breathing the welding fumes in the closed" space as described earlier, and that his lungs were so badly damaged he would never again be able to perform ordinary manual labor.

Supplementing this medical evidence was a report from a lung specialist who diagnosed Parker's condition as "chronic obstructive pulmonary disease, bronchitis, chronic pleurisy and chronic gingivitis." The medical expert thought Parker's exposure to the welding rod fumes in the unventilated tank for the period of time in question caused "serious damage . . . to the tracheobronchial tree and lungs of the patient and that this has aggravated a pre-existing condition of the respiratory organs" resulting in the unfortunate fellow being unable to perform ordinary physical labor "for the rest of his life."

A physician hired by the employer, on the other hand, said Parker's lung x-rays looked normal to him and that while the enclosed welding may have caused a little bronchitis, the claimant's main problem was worrying about his deep rapid breathing and sore gums. To this internal medicine man Parker's physical condition appeared to be good and he therefore thought he ought to go back to work. Interestingly, however, the physician suggested he avoid welding in closed areas unless good ventilation is provided or a respirator is worn.

## II

The employer, notwithstanding the strength of Parker's medical evidence, insists that it is inadequate because it is "incompetent" and it is incompetent because neither of claimant's physicians stated "unequivocally or with certainty, that claimant did in fact breathe these *contaminants* [the three toxic fumes given off by an arc welding rod] which either caused or aggravated claimant's condition; therefore, neither [physician's opinion] is competent to support the award." (emphasis not ours)

Either this argument is too subtle for us to comprehend or it is an incredible exercise in sophistry. As we read it the employer is

suggesting that before a worker can receive compensation benefits for an on-the-job injury a physician will have to be found who is willing to swear he has personal knowledge of the relevant medical history involved or at least vouch for the truth of it. That might take a bit of doing. The contention is so patently absurd it defies sensible discussion. All the physicians involved in this case, including the one used by the employer, premised their opinions on the historical facts given them by the claimant. No one even questioned, much less attempted to rebut, the history he gave and if they had it would have been up to the court, not the physician, to determine its validity. Even the employer's own physician assumed Parker had to have breathed the contaminants because this is what he thought caused "acute bronchitis," and he recommended future work in a closed unventilated space be avoided. If this recommendation was not because Parker would otherwise breathe the fumes then it is not clear why he bothered to make it.

The least the employer could have done would have been to footnote the captious contention with an explanation as to how it would be possible for a worker to weld seven feet inside the 36-inch pressure vessel in question without breathing the tremendous quantity of smoke and fumes given off by an arc welding electrode during an electrical discharge hot enough to melt thick gauge steel. Frankly the recorded disclosure of the employer's apparent lack of concern regarding the existence of such a dangerous working condition is appalling.

We hold the award is supported by ample, competent and, indeed, convincing evidence.

Affirmed.

BACON, P. J., and NEPTUNE, J., concur.